Severance *v.* Heyl & Patterson, Inc., Appellant.

Argued March 17, 1932. Before FRAZER, C. J., SIMP-SON, KEPHART, MAXEY, DREW and LINN, JJ.

*E. B. Strassburger,* with him *McKenna & McKenna,* for appellant.—The provision that notice is required to terminate the lease applies only to the first renewal.

The provision of the lease as to taxes has no relation to renewal.

The payment of taxes in January, 1931, was not an agreement to renew for an additional term beginning May 1, 1931.

The case at bar is easily distinguished from cases where the acts of the parties conclusively establish a renewal: Graham v. Dempsey, 169 Pa. 460; Cairns v. Llewellyn, 2 Pa. Superior Ct. 599; Wilcox v. I. & S. Co., 147 Pa. 540.

The court at all events should have opened the judgment and allowed appellant to file an affidavit of defense and its failure to do so can be reviewed by this court: Heist v. Tobias, 182 Pa. 442; Woodward v. Carson, 208 Pa. 144; Wilcox v. I. & S. Co., 147 Pa. 540; Cramer v. Bank, 2 Grant 267; Logan v. Herron, 8 S. & R. 460; Brandson v. Kitchenman, 148 Pa. 541.

The rendering of the bill for taxes and the payment thereof alone did not constitute an offer and acceptance: Phœnixville Boro., v. Walters, 147 Pa. 501.

*Charles Alvin Jones,* of *Sterrett, Acheson & Jones,* for appellee.—The admitted conduct of the parties in January, 1931, was the efficacious means adopted by them to evidence their agreement to renew the lease for a year from May 1st following, as provided for by the lease.

Any act, expression or course of conduct indicating a tenant's election to renew a lease under the provisions thereof is sufficient. The parties' acts constitute their agreement: White v. Long, 289 Pa. 525; Dickinson v. Robinson, 272 Fed. 77; Hendler v. Quigley, 38 Pa. Superior Ct. 39.

OPINION BY MR. JUSTICE MAXEY, May 26, 1932:

Judgment was entered in this case on a confession of judgment in an agreement of lease between the plaintiff, F. W. Severance, trustee, lessor, and the defendant, Heyl & Patterson, Inc., the lessee. The articles of agreement were signed in April, 1920. It demised premises located in Pittsburgh, Pa. The term began on the first day of May, 1920, and was for a period of three years.

The consideration was payable quarterly, and was divided into three kinds: (1) $3,340.50 on the first day of each and every quarter beginning with May 1, 1920; (2) the amount of taxes levied after January 1, 1920, and before the end of the term on any machinery or other fixtures placed on the premises by the lessee; and (3) the amount by which the taxes levied on the leased premises for any tax year during the term exceeded the taxes levied on the leased premises for the tax year 1920. In only one instance was it provided that only one-third of such excess of taxes should be payable. This was in the year that the lease terminated, 1923, unless there should be an agreement or agreements to continue the lease or unless there was a holding-over. It was also agreed that these "rents which were measured by the excess taxes" were to be paid as soon as the respective taxes became payable.

It was further agreed between the parties "that any agreement to continue the tenancy without mention of the terms on which the premises are to be held, or a holding over after the expiration of the term with the consent of the lessor, shall be a renewal of this lease, with all the covenants, for the term of one year only from the expiration of the term and so on for every year thereafter, during which such tenancy shall be continued, or holding over take place. Provided that in any such case of holding over, the stated annual rent shall be paid in equal quarter-yearly installments, in advance, beginning May 1st, and said further rent measured by the excess taxes shall be two-thirds of such excess for the tax year current at the beginning of the additional term of one year and one-third of such excess for the tax year current at the end of such additional year; and provided further that unless one of the parties hereto gives the other written notice prior to May 1, 1922, that there will be no renewal of this lease, it is agreed that both parties shall be bound to a renewal of this lease for one year from May 1, 1923, on the terms above stated, except that this provision which effects a renewal on default of notice shall apply to the one instance only and shall not itself be renewed."

The lease was in force under these terms on January 21, 1931, and up to and including this date all classes of rents were paid to the plaintiff strictly according to the agreement. On January 21, 1931, the trustee billed the defendant for the excess of city and school taxes for the tax year of 1931 (the excess being over the assessment for 1920) and the tenant paid this.

The plaintiff contends that this payment of the taxes for the eight months from May 1, 1931, was a renewal of the lease for the term of one year beginning May 1, 1931. The defendant contends that the payment of the two-thirds of the taxes (covering the period from May 1st, to December 31, 1931) "was applicable to the first eight months of an additional term beginning May 1,

1931, in the event that the tenant elected to hold over for such additional term."

Notice was given to the landlord by the tenant in March of 1931, of its intention not to renew the lease for the year beginning May 1, 1931, and before April 30, 1931, the defendant had vacated the premises. Thereupon the plaintiff entered this judgment, and a petition was filed to open it.

The court below discharged the rule to open judgment and permitted the judgment to stand upon the ground that the payment of the tax for the entire year of 1931, renewed the lease for the entire year. The court below said that the question involved "is whether the rendering of the bill for taxes which were made rent covered the entire year, and the payment of the entire bill without more, is an agreement to continue the tenancy." And, in answering the question, said: "The rendering of the bill is an offer and the payment by the tenant for the full year is an acceptance. It was so treated for seven years."

The lease itself provides that it may be renewed "for the term of one year only from the expiration of the term and so on for every year thereafter" by two methods: (1) "An agreement to continue the tenancy," or (2) "A holding over." The tenant did not hold over after April 30, 1931, and did not agree to continue the tenancy after that date, unless the payment of excess taxes in January, 1931, be so construed. The court below inferred an agreement to renew the term after April 30, 1931, from the mere fact that the tenant paid in January, 1931, a sum equivalent to the excess of the 1931 city taxes on the 1920 taxes on this property.

We hold that the payment of this excess by the tenant did not as a matter of law amount to an agreement to continue the lease then in force for the term of one year beginning May 1, 1931, as the landlord alleged in his affidavit.

When the renewal of a lease beyond its stated term depends on an act of the tenant, this must be an act of which he has the choice of performance or of nonperformance. For example, in the case before us, the tenant could (1) enter into an agreement with the landlord to continue the tenancy or he could decline to do so; (2) he could hold over or move out. But as he was in possession of the leased premises in January, 1931, and wished to remain in possession until April 30, 1931, he had no choice about paying in January, 1931, a sum equal to the excess of the city taxes for 1931 over the city taxes for 1920, since the 1931 city taxes were then payable and the lease expressly provided that "further rents, which are measured by taxes, to be paid whenever and as soon as the respective taxes may become payable." The payment of this excess sum in January, 1931, was a condition of the tenant's remaining in possession during the then current term; it was in no sense a quid pro quo for a renewal of the lease for another year beginning May 1, 1931. Unless the tenant violated the express term of the lease, he had no choice in January, 1931, as to the payment or nonpayment of the excess city taxes for the year 1931 when the landlord rendered him a bill for the same as he did in the month of January in that year.

The landlord in this proceeding is attempting to import legal significance to the mere payment of "rent" due in January, 1931, which the lease nowhere gives to that act. If the tenant had the right to pay in January only $\frac{1}{12}$ or $\frac{1}{3}$ of the excess taxes of 1931 and had voluntarily paid the entire excess, there might be some logical basis for the inference that the payment of the entire sum by the tenant and its acceptance by the landlord constituted an agreement to renew the lease beyond the then current term, but the tenant had no such right to pay a fractional part of the excess taxes; under the lease on which depended his tenancy up to the end of the then current term, he had to pay all of such excess taxes when

such taxes "became payable," and that was in January, 1931. This payment by the tenant did not have even the slightest legal connection with any extension of the then current term.

Even if the tenant had expressly notified the landlord in January that he was going to vacate the premises on April 30th, the landlord could, under the express terms of the lease, demand in January, 1931, a sum equal to the amount the 1931 taxes then payable exceeded the 1920 taxes, for according to the lease it was only in the year 1923 that "only ⅓ of such excess of taxes shall be payable." Since the landlord was in a position to demand from the tenant in January of each year, except 1923, the payment in that month of any excess-over-1920 of the taxes then (i. e., in a later year) payable, it follows, if appellee's contention as to the significance of the excess tax payment in January is accepted, that the tenant would have been placed each January in a position where he was compelled by making the payment called for by the plain terms of the lease to automatically renew the lease for another year beyond its then current term. Had he violated any of the conditions or terms of the lease, he was subject to a penalty of an increased annual rent of $13,362 in addition to the rent thereinbefore reserved.

It is true that the lease provides that in case of a "holding over" after the expiration of the term, with the consent of the lessor, "said further rent measured by the excess taxes shall be ⅔ of such excess for the tax year current at the beginning of the additional term of one year [i. e., one year from May 1st] and one-third of such excess for the tax year current at the end of such additional year [i. e., from January 1st to April 30th]," but this provision stipulates only *for* what thirds of the term the "excess taxes" shall be paid as rent, not *when* it shall be paid; it does not excuse the tenant from paying to the landlord these excesses when the current taxes by which the excesses are measured, are payable. If the

necessary payment by the tenant of excess taxes in January of each year constituted an agreement to renew the lease for another year after May 1st, the provision in the lease about "holding over" becomes useless and of no significance, unless we assume that the landlord would suffer the tenant to violate his lease by not paying this excess in January when it was payable and would further suffer him in spite of this violation of the plain terms of the lease to "hold over" and start a new term in the following May.

It is also of some significance that the above quoted provision for allocation of excess taxes to thirds of the year relates to "any such case of holding over" and not to "an agreement to continue the tenancy." There is no provision in the lease for an allocation of taxes where the lease is renewed by agreement. Apparently the allocation of taxes in such a case would be provided for in the agreement. The tenant's obedience to the specific prescription to pay the excess taxes when payable (i. e., in January of each year) cannot be construed as an agreement to renew the lease for another year from the following May first.

Cases cited by appellee are inapplicable to the facts in this case. In Graham v. Dempsey, 169 Pa. 460, the tenant, though having given the required written notice of an intention to vacate the premises at the end of his term, continued in possession and it was held that a tenant cannot escape liability for rent for another term by saying he is going out at the end of his term and then not going.

If the parties had intended to make the payment of excess taxes in January, the equivalent of an agreement to renew the lease for another term, they should have said so. The courts cannot read into a contract something that is not there expressly or by necessary implication. "The law presumes that the parties understood the import of their contract, and that they had the intention which its terms manifest. It is not within the

function of the judiciary to look outside of the instrument to get at the intention of the parties, and then carry out that intention regardless of whether the instrument contains language sufficient to express it; but their sole duty is to find out what was meant by the language of the instrument": 6 R. C. L., section 225, page 835-6.

There is nothing in the language of the contract in this case to support the proposition that the payment of the excess of taxes in January meant the extension of the lease for one year beyond the following May. That the payment in January of this excess as rent did not by itself extend the lease another year from the end of the then current term is a proposition supported both by reason and authority. "The fact that money was paid as rent does not establish any particular term or holding and if the beginning of the tenancy or its length is in question, these facts must be shown by other evidence": Underhill, Landlord & Tenant, volume 1, page 511; Wilcox v. Montour Iron & Steel Co., 147 Pa. 540.

The order of the court below is reversed, the rule to open judgment is reinstated, and the record remitted for further proceedings.